The Honourable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honourable Court may draw near, give their attendance, and they shall be heard. God save the United States of America and this Honourable Court. Good morning. I believe Council already know that Judge Celia is unable to participate today in argument, but will remain on the case for deciding the case. So you'll have to make do with just the two of us up here. Please be seated. Court is in session. Today's cases will be called as previously announced. The times will be as allotted to Council. The first case today is No. 23-1393, Julian Quinones v. Frequency Therapeutics, Inc. at all. At this time, would Council, for the appellant, please introduce yourself on the record to begin. Good morning. May it please the Court, my name is Amanda Lawrence, and I'm here today representing appellant Julian Quinones. I would like to reserve three minutes for rebuttal, if that's okay, please. Yes, you may. Thank you. This Court should reverse the District Court's decision because the most logical and plausible inference is that defendants were reckless. The complaint has allegations, first of all, from a highly placed confidential witness that are corroborated by online posts, later admissions by the company, and from information uncovered post-dismissal. These allegations show that individuals faked their way into this pivotal hearing study and hopelessly biased its results. The complaint also has allegations about insider trading and about the centrality of the testing phase. When these allegations, taken together and when applied with common sense and practical judgment, lead to the most cogent and compelling inference that defendants acted with CENTER. Even the District Court said this was a closed case. And I remind your honors that where there are equally strong inferences for and against CENTER, TELABs awards the tie to the plaintiff. So first, there are compelling confidential witness allegations. This was a highly placed confidential witness who ran the Phase 2A testing and interacted regularly with Defendant LaBelle. The CW was obviously in a position to know the information provided. That information included that it was common knowledge, including by Defendant LaBelle, that individuals would fake their way into studies. Could you, if I read the record carefully, the District Court judge seemed to presume, if not even find, that at least two of the statements that are challenged were false. And regarding the study and the bona fides of the study, particularly as to whether or not all participants had difficulty hearing words. But the court nevertheless seemed to rule against you because there was no chronological alignment between evidence that the defendants knew that was false and the time that they made the statement. And as I looked through the pleading, your confidential witness doesn't seem to place in time when the defendants had the knowledge that he says they had. So that's correct. The two misstatements that the District Court appellate and that we're here today on say that all subjects have meaningful word recognition deficits. What the confidential witness says is that personnel at the company were aware, and this does give a time, of the February 2020 Tinnitus Talk post. Where the minimum word recognition deficit percentage is revealed. And then importantly, the CW talks about investigators contacting Defendant LaBelle during the pendency of the study. To discuss alarming discrepancies between what individuals could hear at screening versus what they could hear during the testing phases. Now, the test ends in December 2020. Screening ends in September 2020. Judge Young upheld a misstatement from January 11th, 2020. There can be no question that the phone calls from the investigators occurred at least by the January 11th point, because the study ended in December 2020. If they phone Defendant LaBelle to talk about the ongoing study and the study ended in December, the only logical inference is that those phone calls were made at least prior to the January 11th, 2021 misstatement. And how do we know with specificity what was said in that phone conversation? We know from CW1, CW1 was very clear that the investigators told Defendant LaBelle about alarming, as I said, alarming differences between what individuals could hear in the beginning and in the end. During that phone conversation, as opposed to some other conversation. Because the CW, does the CW place in time the investigators' calls? Only places in time that they occurred during the pendency of the trial, which, as I said, ended in December 2020. But I would point out that this is corroborated by Defendant's admissions. In the June 2021 call, this is after the end of the class period, the conference call, Defendants discussed how there was one individual who at screening couldn't hear 22, of the 50 words, but then at the end of the study, could only not hear three of the 50. So it had this miraculous recovery in hearing, but was in the placebo group. So we know that these alarming deficiencies were happening. This is corroborated not only by that June call, but also by the information now contained in the proposed amended complaint. But how does the June call go to CNTR? It just buttresses, it just shows that it's corroborating what the CW said. In a lot of the cases that Defendants put forth, there aren't corroborating allegations. Here we have the online posts that corroborate the CW, we have the June call that corroborates the CW. And importantly, we now have the proposed amended complaint with two other CWs corroborating this. You've mentioned several times the proposed amended complaint. That's not before us, is it? Well, it's in the record. Unfortunately, the timing of it didn't have it so that it's in the appendix. The timing of it was that we had to file our notice of appeal prior to the amended complaint being filed. But I do believe that this court has the authority to remand with instructions to allow amendment. And we would ask that the court consider doing that. But there was no Rule 15 motion filed prior to entry of final judgment, as I understand it. So there was no Rule 15 motion filed. So you need a Rule 60 motion to reopen the record to allow you to file a Rule 15 motion to amend. So we filed a Rule 62.1 motion because the court never issued final judgment and we were confused and we phoned the clerk. We said there was no final judgment and we could amend. So it was somewhat confusing situation. So we filed a Rule 62.1 motion. Defendants argued that we should have filed a Rule 60. We argued in our papers that are in the record that the court could convert those to a Rule 60. And that we did meet the Rule 60 standards because it was newly discovered evidence. These CWs were only found in June 2023. He dismissed the complaint in March 2023. I think the problem is that there is no ruling on appeal concerning the supplemental or the amended complaint. That's correct. So it's not in the record before us. The district court felt it couldn't act on any such motion while the appeal was pending. It didn't seem to foreclose the possibility that after the appeal is over you could file a Rule 60 motion and see what happens. I suppose that's correct. However, I read the handwritten ruling to be that this court could remain with instructions to amend. And I know that 28 U.S.C. 2106 allows a court of appellate jurisdiction to direct the entry of such appropriate judgment. As may be just under the circumstances. I was also looking at this court's decision in Roast where it was in the exact same fact pattern. Where what the court did was dismiss the claims but ordered the district court to allow amendment. So I believe that would be permissible and just in this situation if that is what your honors decided to do. The case that you cite, was that a situation where Rule 60 was in play? No, it wasn't. Because there what had happened is that... So if it wasn't, is there an issue at all here? Do we have any kind of timing worry given that this is a Rule 60? So if we were to remand with those instructions, are we under any time pressure to do that? Rule 60 allows one year. So I do believe that we're safe. And then there is some case law that expands that one year. So I do not believe there's a timing issue. In the Roast case, there was no Rule 60. The plaintiff had just dropped a footnote in the brief asking for leave to amend. And this court said that was enough. Dismissed the claims with order to allow amendment. So we're sort of one step further than the Roast case. But I do not believe there's a timing issue under Rule 60 given the one year provision in the statute. The trickiness is I think we have other cases that suggest otherwise. You've got to file a Rule 15 motion before judgment is entered. That's why we've encouraged courts to not dismiss with prejudice in the first instance. So I was looking at one of those cases, and it was the Fisher v. Cadent case. And it specifically from, Your Honors, from this court, it specifically distinguished situations like the one that we're in, where you have appealed on the merits. In that instance, in the Fisher v. Cadent case, it said the Court of Appeals may, in its discretion and in the interest of justice, affirm the dismissal of the complaint, yet nonetheless permit further amendment of it. I'm not in any way suggesting that you should affirm dismissal of the complaint. I'm just suggesting that this is also an alternative. Thank you. Thank you, counsel. At this time, a counsel for the appellees will please introduce himself on the record to begin. Good morning, Your Honors. Roman Martinez for the defendants. Your Honor, may it please the Court, this case was rightly dismissed. We won on scienter, and I want to focus mainly on scienter, but I also want to emphasize that the allegedly false statements here were completely innocuous descriptions of the study design. They were not false. We think you can affirm on either ground, either on scienter or on falsity. I thought there was a statement that all the participants had difficulty with words. Right, and I think in context, what those statements meant was that all these participants had difficulty with words as measured on the entrance test. It didn't say that, though. I think if you look, Your Honor, respectfully at the full context of the presentations, I think it's very clear that when it's talking about word recognition deficits, it's talking about the deficits in word recognition as measured on the entry test. So you actually want us to rule that if the defendants knew everything about the study that we now knew, their statements, including the ones in January, would have been not misleading? I think if you look at the statements in context, I think what they're representing is their statements about the baseline entry into the study based on the test. And I think if you look at the disclosures that were made in the 10Q, the 10Q said that there's a possibility of patient misrepresentation. There's a difference between a possibility and an actuality. You disclose the possibility if you don't think there's an actuality, but if you know they're doing it, you can't go tell people that this is a bona fide test if you know it's bogus? I think for the reasons you're suggesting, Your Honor, I think CENTER is the more straightforward ground, and I'm happy to turn to that and maybe come back at the end to falsity if that's okay with Your Honors. I think you've hit on the key problem with the CENTER allegations in this case, which is there's a massive timing problem. There's no evidence that's been alleged by the other side that at the time that these two alleged statements, that these two statements were made, that any of my clients knew or recklessly disregarded that people had faked their way into the study or had misrepresented their hearing scores into the study. And I just want to talk about, I think my friend on the other side listed four different reasons why she thought there was CENTER. I'd like to just quickly address each one. First, she referenced the Tinnitus Talk website postings that had been posted in February 2020. So that is a timing that could work in theory. The problem is that the other side has not alleged that anyone at the company, and especially the defendants, Mr. Locchino, Mr. Lavelle, or anyone at that level of the company was aware of those February 2020 postings. And just to be clear, this website is a forum where there are tens of thousands of posts made by individuals discussing conditions relating to hearing loss and tinnitus. And the particular thread that's at issue here involved 9,000 different posts spanning 250 pages. And the other side hasn't alleged that either Mr. Locchino or Mr. Lavelle actually saw these posts or were aware of them. So I think the Tinnitus Talks forum really can't establish CENTER. The second thing that my friend pointed to were these conversations that occurred allegedly in the complaint between investigators and Mr. Lavelle reporting on discrepancies between the baseline scores of certain test participants and then the scores that had manifested during the actual study. The problem with that allegation is that there's no allegation in the complaint about the timing. None whatsoever. I think the key allegation appears in paragraph 65 of the complaint, and it's completely nonspecific as to timing. My friend suggested during her presentation that the allegation was specific as to timing and said that it occurred. I believe she indicated that it occurred during the time when the study was being conducted, i.e., before December 2020. That's not alleged in the complaint. It could have happened before then. It could have happened later when the results were being tabulated. We just don't know. It was their complaint. They did not plead this. So you're focused on which paragraph in the complaint? Paragraph 65 of the complaint. And that's, I think, the principal paragraph where it's reflecting the confidential witness number one is apparently there were conversations where investigators contacted Lavelle about the discrepancy, and there's no timing that's indicated there at all as to when those conversations happened. And so there's really no basis to conclude that they happened before the statements were made. I would say, though, even if the other side had alleged that those conversations did occur before the statements were made, they would still not establish the enter. Because what the conversations talk about is a discrepancy between the baseline score and the score that was being measured while the study was being conducted. The discrepancy. Now, just to keep in mind, the whole purpose of this drug was to create a discrepancy between your hearing level before you took the drug and after you took the drug. So the mere fact that there's a discrepancy doesn't show anything. Well, if it was in the placebo group. Exactly. If it was in the placebo group. But the problem with the allegation is it was a double blind test. So at the time that the plaintiffs say this conversation happened, which they say they said it here today a couple times, even though it wasn't alleged in the complaint, they said it happened before December 2020. During that time, it was still a double blind study. So no one knew who was in the placebo group. And I want to get to their amended allegations, because I don't think they're properly before the court. But even in their amended allegations, they say they're very clear this was a double blind study. And so at the time that we're now hearing from counsel that these conversations happened, allegedly, even at that time, people didn't know that this discrepancy was due to faking as opposed to due to the drug working well. And I would suggest as well, it's true that there was reason to believe that there would be significant discrepancies, significant improvements, because if you look at the results of the Phase I study, which are reported in the same slide presentations that are at issue here, one of the patients there showed enormous improvement. Went from having 24 no responses at the baseline before entering the study to having only three no responses during the study. So the mere fact that there was a discrepancy is not enough to show that there was cheating, faking, anything like that. So for those two reasons, I think those conversations don't work. No specificity as to timing. And even if there had been specificity as to timing, it was just a discrepancy, and the discrepancy doesn't show that there was a problem necessarily. Now, the third thing my friend on the other side pointed to was the June 2021 call, when my clients, as they had been throughout this process, were fully disclosing the results of the study and the fact that there were potential issues that made it hard to draw firm conclusions at the study. And they say that that somehow shows scienter, but it doesn't. If anything, it shows the opposite. The statements that were made in June 2021 do not say anything about what the defendants knew at the time that the challenge statements were made in August 2020 or January 2021. If anything, the fact that the company was fully disclosing the results and the potential problem with the study shows that they were acting in good faith and they were trying to put forward a legitimate study and they were reporting to investors what they found, including the fact that there were potentially some issues. And then the final thing, and this is really quite, in my view, respectfully, Your Honor, quite disturbing. I think of this emphasis on the amended complaint that they put into the record after a final order was issued. They filed a Rule 62.1 motion. They're trying to bring it to your attention in this court in a way that's highly improper. First of all, it's not actually part of the record on the decision on the motion to dismiss. Second of all, these materials were included in the joint appendix, which is a joint appendix, under my signature without our consent and, frankly, without our knowledge. We had an email exchange with the other side on July 12th in which they told us specifically the 10 items that were going to be included. We signed off on it. We reached agreement. And they then just threw this stuff into the record without telling us. And then they're here arguing that you should look to it as a reason to resurrect a complaint that didn't have these allegations. We think that's highly improper. The Ninth Circuit faced a similar situation. They struck the allegations, didn't consider them. I also think that there are other problems with these allegations and this whole leave to amend idea. There's sort of reasons that the leave to amend request was waived or forfeited, number one, and then reasons why, even if it hadn't been waived or forfeited, neither Rule 15 amendment nor Rule 62 reopening should be granted because of the inordinate delay. Let me just talk about those. With respect to the waiver problem, this request for leave to amend was waived four times over. Four times over. Let me just walk through it. Number one, the first time they asked for leave to amend was in a boilerplate request in their opposition to our motion to dismiss. It was in a footnote on page 20 of their opposition. That's not enough. And they didn't explain what they would put in the record, what allegations they would make to actually amend the complaint. So they didn't really raise it before the initial decision. Secondly, as Your Honor suggested, usually what happens in these cases is there's a motion to dismiss decision, and then if the other side thinks they can make better allegations, even if the complaint is dismissed with prejudice, what they'll then do is file a Rule 60 motion and say that they want to amend the complaint under Rule 15, and importantly, they'll explain what they're going to allege so that the district court knows whether there's a basis to actually reopen and grant amendment. They didn't do any of that. They did not file between the time in which the district court ruled and the time that they filed their own notice of appeal. They did not ask for, under Rule 60, under Rule 15, under nothing, they didn't ask for leave to amend. Number three, they filed a Rule 62.1 motion, which was denied. They didn't appeal that. They could have appealed that. That could have brought up all these issues, and they could have then had more of a basis to talk about the subject matter of their amended complaint. They did not appeal their Rule 62.1 motion. And then, Your Honor, finally we get to this court, and they're filing their briefs. The idea of leave to amend is not raised as an issue in their opening brief. It's not requested anywhere. The only place that they request it in this court is in yet another footnote, sort of a boilerplate footnote, on page 9 of their reply brief, which is obviously way too late to raise this issue. So we think the request for leave to amend was waived not once, not twice, not three times, four times over. Even if it weren't waived, even if there was some sort of basis to consider a request to reopen or amend, they wouldn't be able to get it. They wouldn't be entitled to it, either under Rule 15, which prohibits amendment when there's undue delay, or under Rule 60, which requires there to be reasonable diligence to get additional information. Here, by their own admission, by the other side's own admission, they waited two years before even contacting the new The original complaint was filed in June 2021, and by their own admission, you can read this in their 62.1 motions, they say that they didn't contact these confidential witnesses until June 2023. Now, why didn't they do that? They're very candid, and I appreciate the candor. In their reply brief, in support of their Rule 62.1 motion, they said that the reason that they did not do an investigation for at least the first of those two years was because they didn't know if they were going to be lead counsel in the case. So they said there was no economic reason, even though they'd been hired by a client, even though they'd filed a lawsuit on behalf of the client, they said, basically, we don't have to do any more investigating, we don't have to talk to witnesses, because we don't know if we're going to be the lead counsel. It doesn't make economic sense for us to do that. So they waited for a year. Then, even after they had our motion to dismiss that put them on notice of the issues, even after the confidential witnesses had left the company, even after the District Court rules, they still don't look for these witnesses until June 2023. That's the only time when they start talking to them. And they have other excuses in their Rule 62.1 reply. I encourage you to read it. Page 1 and page 11 are enlightening. They basically say that their investigator didn't do a good job in finding these witnesses. That might be true, and that might be unfortunate, but the problem with that is that it does not show reasonable diligence, and it does show undue delay. So even if they hadn't waived their request for leave to amend four times over, they still would have this problem, which is that they're not entitled to reopen the judgment. They're not entitled to amend. Now, Your Honor, I just have two minutes left. I think I don't have anything further to say on Sienter. I'd welcome any questions on Sienter. I just do want to say one last thing about the falsity point. Your Honor, we had a back-and-forth about how to interpret the statements. I think there's a second reason that there's no falsity here, which is that the statements themselves, that the other side has not alleged that anyone at the baseline moment had, when applying to go into the test, actually had the lack of a meaningful word deficit. I think the closest that they come is they point to an individual who's referenced in our client's disclosure in March 2023, an individual who had 22 no responses at baseline and three no responses on the test. That's the closest they come, but they certainly can't establish Sienter as that person. There's no reason to think that any of our clients knew that that person had that discrepancy and was in the placebo group during the relevant time. Unless there are questions, Your Honor, I would respectfully ask the court to affirm the lower court's decision on any of these grounds. Thank you.  Thank you, counsel. At this time, if counsel for the appellant would please reintroduce herself on the record. She has a three-minute rebuttal. Thank you, Your Honors. Again, Amanda Lawrence on behalf of Appellant Julian Quinones. I want to start, please, with what my counsel ended with, which was regarding the investigation and the proposed amended complaint. I want to make the timeline very clear. We filed our amended complaint in 2022, one month, less than one month after CW2 and CW3 left frequency. At the time that we filed our amended complaint, there were no open leads. We generate our lead list from publicly available information. CW2 and CW3 had not changed their publicly available information to show that they were former employees. And we have a policy that I think is pretty sound of not contacting current employees of companies. So we had done all we could do at the point of filing the amended complaint on May 16, 2022. We get dismissed over a year, almost a year later. Then we have one month to appeal. We didn't quite know what to do because we weren't sure if it was a final order, if it allowed amendment or not. We contacted the clerk who said we could amend. At that point in time, we didn't have anything to add to the equation. It would have been a futile amendment and a waste of all judicial resources. So we filed the notice of appeal. We still stand by our allegations in the complaint in front of your honors. We continued our investigation and only in June of 2023 did we reach CW2, who then told us about CW3. And it was only in the end of June 2023, once this notice of appeal to preserve our rights was already filed, that we had the full story. So what is before this court are smoke and gun allegations in the proposed amended complaint that corroborate everything and more in the amended complaint. If you could go back to the complaint that's before us, when I asked about chronology, you had pointed towards an allegation that the conversations with the investigators took place during the time that the study was being conducted. Hence, it would have been prior to January 11. I think I heard from Counselor Flea of the side that there is no such allegation placing that in time. Which paragraph of the amended complaint are you referring us to that would place in time a conversation between the investigator and the defendants, bearing on the fact that the trial judge assumed was false? So defense counsel is correct. I would point to the same paragraph. And that paragraph does talk about calls that were discussing the discrepancies investigators were seeing between screening and subsequent examinations. That paragraph 65 was it? Correct. I would also point out that defense counsel said we didn't allege that any personnel at frequency knew about the February 2020 blog post. That is on A32 in the record. And again, the proposed amended complaint places... Where does it say that the conversations with the investigators took place during, while the study was ongoing? It says that they were calling to talk about alarming discrepancies between screening and subsequent examinations. All subsequent examinations ended by December 2020. So it makes no sense that they would be calling to discuss examinations that were long over. Paragraph 65? Correct. Several individuals on the Tinnitus Talk Forum reported they had tried to enroll in 2A and been rejected. I have paragraph 65 beginning with, CW1 also detailed how the company was aware of the self-selection and volunteer bias. Okay, we must be looking at different documents here. I'm on A33 of the joint appendix. But if you are looking at the proposed amended complaint, it places those conversations in the first quarter. You're looking at A33? Correct. While you're looking for that, I'll just state that the double blind doesn't really matter. What we meant is that LaBelle would have had access to the fact that the placebo group was having this remarkable hearing recovery. And my counsel said that the discrepancies don't show that they were fakers. But I would point out that on a March 23, 2021 call, they admitted to the fakers. Now, the problem is we don't have access to this call transcript because Frequency hasn't published it. I check every day and it still hasn't been published. I believe my time is up unless Your Honor has questions. Thank you for referring me to A33. As far as timing, what in that places it? It says according to CW1, several investigators contacted LaBelle about this discrepancy to express their concerns to him. It doesn't say when that occurred. No, but it does say above that, that the call was about discrepancies they were seeing from subsequent examinations. And those subsequent examinations would have concluded by December 2020. And then again, as I said, in the PAC, we now know these calls happened long before that in the first quarter of the year. But the key thing for you on CENTER is that the investigators contacted LaBelle and gave him information that would cause him to believe that the statements about the study were false. And that he had that belief at the time they were made. I'm not seeing the chronological point here. I'm not seeing how you place these conversations between LaBelle and the investigators prior to January. I see how you place the information that the investigators got prior to January, but where's the evidence that they conveyed it to LaBelle prior to January 11? So two parts to that. The first is, where is it? Again, common sense. Why call with concerns about a study when the study's over and the company could announce it any minute? And then I would point to the PAC. But I would also say that I don't necessarily think we hang our hat on this one allegation. The CW allegations, defense counsel correctly pointed out, there were four separate buckets that the CW gave. This was one of them. You combine this with the Tinnitus Talk post where we said personnel at the company had identified the exact February 2021, even amongst the 650 posts. And then you have the fact that they were monitoring the data. And then you have that they knew fakers were present in the study. And that they changed the study to require investigators to sign confidentiality agreements. And then we haven't even talked about that today, but you add in the suspiciously timed stock sales, and you add in the fact that this was the only product for the company. And the logical inference is that defendants acted with SIENTA. Thank you. Thank you, counsel. That concludes argument in this case.